**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ECHO, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: |
| ) | FILED: DECEMBER 11, 2008 |
| TIMBERLAND MACHINES & ) | 08 CV 7123 |
| IRRIGATION, INC. ) | JUDGE KOCORAS |
| ) | MAGISTRATE JUDGE NOLAN |
| Defendant. ) | |

**COMPLAINT** JH

ECHO, INCORPORATED by and through its attorneys, STEVEN L. KATZ and JASON

M. METNICK of the law firm of MASUDA, FUNAI, EIFERT & MITCHELL, LTD., for its

Complaint against TIMBERLAND MACHINES & IRRIGATION, INC., states as follows:

**THE PARTIES**

1.     Plaintiff, ECHO, INCORPORATED ("Echo") is a corporation incorporated under

the laws of the State of Illinois, with its principal place of business located at 400 Oakwood

Road, Lake Zurich, Illinois 60047.

2.     Defendant, TIMBERLAND MACHINES & IRRIGATION, INC. ("Timberland")

is a corporation incorporated under the laws of the State of Delaware, having its principal place

of business located at One Niblick Road, Enfield, Connecticut 06082.

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1)

since the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00

and is between citizens of different states.   Venue is proper pursuant to 28 U.S.C. §1391.

Additionally, the Distributor Agreement (as defined herein and attached as Ex. A) executed between the parties contains a forum selection clause, at §9.9 thereof, designating this judicial district as the proper jurisdiction and venue.

## COUNT I
## BREACH OF CONTRACT

4.　　Echo realleges and incorporates as if fully set forth herein the allegations of paragraphs 1 through 3, inclusive.

5.　　On or about August 19, 2004, Echo and Timberland entered into an Echo Distributor Sales and Service Agreement (the "Distributor Agreement") concerning Timberland's purchase from Echo and resale of certain products (as defined in the Distributor Agreement, the "Products") as a non-exclusive distributor. A copy of the Distributor Agreement is attached hereto and incorporated herein as Ex. A.

6.　　The Distributor Agreement states that "It is expressly understood and agreed by [Timberland] that the provisions of this Agreement shall be deemed part of each purchase order accepted by [Echo]. *See* Ex. A, Distributor Agreement §5.1. Additionally, the Distributor Agreement provides that "Payment shall be due in accordance with terms stated on individual product invoices." *See id.*, Distributor Agreement §5.3.

7.　　Between August 1, 2008 and October 31, 2008, Timberland submitted to Echo multiple purchase orders for Products (the "Purchase Orders").

8. Echo accepted the Purchase Orders from Timberland, and in furtherance thereof, Echo shipped Products and issued invoices (the "Invoices") to Timberland stating the terms of payment applicable to the Purchase Orders.

9. The Invoices required Timberland to make payment in full to Echo by November 25, 2008.

10. Timberland failed to make the required payments due under the Invoices, and is delinquent and in arrears in the principal sum of $630,367.62.

11. Section 7.1(D) of the Distributor Agreement provides in pertinent part that "[Timberland] shall be in default hereunder in the event that: (i) [Timberland] shall fail to pay any indebtedness when due or payable or fail to perform any duty or obligation required to be performed by [Timberland] hereunder or under the terms of any other agreement between [Timberland] and [Echo] . . ." *See* Ex. A, Distributor Agreement §7.1(D).

12. Echo has demanded Timberland to make payment of the delinquent balance due under the Invoices.

13. Notwithstanding such demand, Timberland failed to make payment. Echo has satisfied its obligations under the Distributor Agreement and the Purchase Orders.

14.     As a result of Timberland's nonpayment to Echo, Timberland is in default under the Distributor Agreement.

15.     Section 7.1(E) of the Distributor Agreement provides that "In the event of a default by [Timberland] . . . [Echo] shall, if it so elects, have the following remedies, without prior notice to [Timberland]: (i) The unpaid balance of any and all indebtedness, obligations and liabilities however evidenced and secured shall be accelerated and become immediately due and payable. . ." *See* Ex. A, Distributor Agreement §7.1(E)(i).  Notice of acceleration was provided to Timberland.

16.     As a result of the default by Timberland, there is due and owing from Timberland to Echo under the Distributor Agreement an accelerated indebtedness of $2,785,978.15, resulting from additional Products sold to Timberland for which payment has not been made.

17.     Consequently, the total amount due and owing from Timberland to Echo, exclusive of any applicable interest or any late fees is $3,400,306.97.

**WHEREFORE,** ECHO, INCORPORATED prays for judgment as follows:

A.     A judgment against the defendant TIMBERLAND MACHINES & IRRIGATION, INC., in an amount of no less than $3,400,306.97, plus applicable interest and late fees as provided by agreement of the parties, plus such additional interest and costs as allowed by law; and

B.     Such other and further relief as the Court may deem just and equitable.

## COUNT II
## GOODS SOLD AND DELIVERED

18.     Echo realleges and incorporates as if fully set forth herein the allegations of Paragraphs 1 through 17, inclusive.


19.     Timberland has become indebted to Echo in the amount of $3,400,306.97 by virtue of goods sold and delivered by Echo for the benefit of Timberland.


20.     No part of the amount set forth above has been paid although payment has been demanded, and there is now due and owing the principle amount of $3,400,306.97, exclusive of any applicable interest or any late fees.

**WHEREFORE,** ECHO, INCORPORATED prays for judgment as follows:

A.      A judgment against the defendant TIMBERLAND MACHINES & IRRIGATION, INC., in an amount of no less than $3,400,306.97, plus applicable interest and late fees as provided by agreement of the parties, plus such additional interest and costs as allowed by law; and

B.      Such other and further relief as the Court may deem just and equitable.

## COUNT III
## ACCOUNT STATED

21.     Echo realleges and incorporates as if fully set forth herein the allegations of Paragraphs 1 through 20, inclusive.

22.     In or about October 2008, Echo and Timberland conducted an accounting and exchanged documentation regarding the money, then-past due and owing from Timberland to Echo, being in arrears and unpaid.  Upon this accounting Timberland made a partial payment to Echo on some of the money past due and owing to Echo.

23.     Notwithstanding its agreement to this account stated, Timberland has refused and failed to pay the remainder of amounts past due and owed to Echo.

**WHEREFORE,** ECHO, INCORPORATED prays for judgment as follows:

A.     A judgment against the defendant TIMBERLAND MACHINES & IRRIGATION, INC., in an amount of no less than $3,400,306.97, plus applicable interest and late fees as provided by agreement of the parties, plus such additional interest and costs as allowed by law; and

B.     Such other and further relief as the Court may deem just and equitable.

Dated: December 11, 2008

Respectfully submitted,

**ECHO, INCORPORATED**

By:    /s/ Steven L. Katz        
        One of Its Attorneys

Steven L. Katz, Esq.
Jason M. Metnick, Esq.
Masuda, Funai, Eifert & Mitchell, Ltd.
Attorneys for Plaintiff, Echo, Incorporated
203 N. LaSalle Street, Suite 2500
Chicago, Illinois 60601-1262
(312) 245-7500
(312) 245-7467

N:\SYS02\1750\LITG\0604 - Complaint (12 11 08).doc

# EXHIBIT A

# ECHO
## DISTRIBUTOR SALES AND SERVICE
## AGREEMENT

**ECHO, INCORPORATED**
**400 OAKWOOD ROAD**
**LAKE ZURICH, ILLINOIS 60047**



EXHIBIT

A

| | |
|---|---|
| Company: | ECHO, INCORPORATED<br>400 Oakwood Road<br>Lake Zurich, Illinois 60047 |
| Distributor's Exact Name<br>as indicated in Public<br>Record of State of<br>Organization/Incorporation: | Timberland Machines & Irrigation, Inc. |

**One Niblick Road**
Address
**Enfield, CT 06082**
City     State   Zip Code

Telephone
**Delaware**
State of Organization/Incorporation

| | |
|---|---|
| Principal<br>Representatives<br>of Distributor (or<br>Names of All Partners<br>if Partnership or<br>Name of Owner if<br>Proprietorship): | **Frederick N. Zeytoonjian**<br>Name<br>**Chief Executive Officer**<br>Position |

Residence (if Proprietorship)
**Mark N. Zeytoonjian**
Name
**President**
Position

Residence (if Proprietorship)

| | |
|---|---|
| Date of Execution: | **August 19, 2004** |
| Commencement Date<br>of Agreement: | **August 19, 2004** |
| Products: | **Echo Manufactured and/or sold outdoor power equipmen** |
| Product Location: | **Warehouse(s) in New Hampshire** |
| Primary Area of<br>Responsibility: | **See attached maps.** |

Distributor represents to Company that all of the above information (hereinafter, "Distributor Information") is complete and accurate as of the date of this Echo Distributor, Sales and Service Agreement. Distributor also represents that, during the past (5) years, Distributor has not changed its name, state of incorporation, type of business entity, location of its principal business office, or location of the principal residence(s) of the owner(s) in the case of a proprietorship or partnership, except as follows (if no change state "None"):

## ECHO DISTRIBUTOR SALES AND SERVICE AGREEMENT

This Agreement, made at Lake Zurich, Illinois, by and between ECHO, INCORPORATED, an Illinois corporation, (hereinafter referred to as "Company"), and the Distributor whose name and address appears on the title page hereof (hereinafter referred to as "Distributor").

WITNESSETH:

WHEREAS, Company is engaged in the importation, manufacture, sale, and distribution of various types of outdoor power equipment bearing the trademark ECHO® and other proprietary trademarks and logos of Company, as well as accessories and replacement parts therefor, and

WHEREAS, Distributor is engaged in the business of selling and servicing various types of products related to those imported, sold and manufactured by Company, and

WHEREAS, Distributor desires to be appointed a distributor of the Company's Products in the Primary Area of Responsibility set forth herein (in the United States), which Products are designated on the title page hereof and which are hereinafter collectively, together with accessories and parts therefor, referred to as "Products," and

WHEREAS, Company is agreeable to so appointing Distributor pursuant to the terms and conditions set forth in this Agreement,

NOW, THEREFORE, in consideration of the mutual promises and covenants of the parties as hereinafter more fully set forth, and other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties hereto, hereby agree as follows:

## I. APPOINTMENT

1.1 <u>Appointment</u>. Company hereby appoints Distributor as a distributor of the Products, and Distributor hereby accepts said appointment, all in accordance with the terms and conditions set forth herein. In consideration of said appointment, Distributor hereby agrees to exert its very best efforts during the term of this Agreement to vigorously promote the sale of the Products.

1.2 <u>Primary Area of Responsibility</u>. An area of primary responsibility (hereinafter referred to as the "Primary Area"), as set forth and described on the title page hereof, or as it may be from time to time amended, is hereby established. The Primary Area is established solely for the purpose of assigning responsibility for effectuating adequate advertising and promotional programs as may be necessary to maximize user awareness and acceptance of the Products within the Primary Area, and obtaining adequate penetration of the market potential in said Primary Area for the Products. Distributor's performance in this Primary Area will be taken into account by Company in evaluating Distributor's total sales effort and effectiveness.

1

1.3   Non-Exclusive Appointment. This appointment is non-exclusive and Company shall be free to appoint such other dealers or distributors at any time for the purpose of promoting the sale of the Products described herein. In addition, Company shall have, and retains the continuing right, to make any direct or indirect sales of Products to customers of its choice both within and without the Primary Area, either for use or for resale, including but without limitation, sales to manufacturers or retailers and sales to any firms or corporations operating directly or through branches or subsidiaries within the Primary Area.

1.4   Sales Via Internet. Unless approved by Company in writing or specifically included within the definition of the Primary Area on the title page of this Agreement, the Internet is excluded from the Primary Area and Distributor and Distributor's dealers shall not sell the Products via the Internet. The Company reserves the right, as it may determine in its sole discretion, to itself sell the Products via the Internet and/or to delegate such right to others. Subject to paragraphs 3.4 and 4.6 of this Agreement and all other advertising and marketing policies of the Company as may be in effect from time to time, Distributor may maintain an Internet website which denotes that Distributor is a distributor of the ECHO Products, but in no event may Distributor or Distributor's dealers process orders for the Products via the Internet or any website. In addition, Distributor may provide a hypertext link from Distributor's website to the home page of Company's website. Such Distributor website and link shall be subject to prior review and approval by Company. Distributor acknowledges and agrees that Distributor's dealers shall sell the Products only at retail locations via actual customer visits to a physical retail location, unless other sales methods are approved by Company in writing. Violation of this provision shall be deemed a material breach of this Agreement. Distributor agrees to actively monitor the activities of its dealers in order to ensure compliance with this section. Distributor further acknowledges and agrees that Distributor could encounter severe liability issues in the event Distributor fails to adhere to this provision, including if the Products are sold, via the Internet or otherwise, outside the U.S. or do not meet applicable governmental regulations as a result of any act or omission by Distributor or its dealers in violation of this provision or this Agreement. Company reserves the right to invalidate any warranty coverage with respect to any unauthorized sales of Products.

## II.   PRODUCTS

2.1   Products. The Products governed by this Agreement are those listed on the title page hereof. Any listed Product may be modified, replaced by a new or different product, or removed from the list without prior notice to Distributor if such modification, replacement or removal is the result of Company's action in the nature of (but not limited to) model changes, product discontinuance or product improvement. Company may otherwise modify, replace, or remove Products from the list upon thirty (30) days written notice to Distributor.

2

### III.   COMPANY'S RIGHTS AND OBLIGATIONS

3.1   Instruction Manuals, Etc.  Company shall supply to Distributor from time to time such quantities of instruction manuals as well as catalogs, circulars or other printed material which Company may have on hand and which Company deems useful to Distributor to conduct sales of the Products.

3.2   Advertising Materials.  Company shall furnish to Distributor such quantities of art work, brochures or similar advertising aids which Company deems appropriate and which Distributor may use in advertising and promotional campaigns for the Products, including displays to be made at trade shows and the like.  It is understood that Company shall have no obligation to engage in advertising of the Products on its own account.

3.3   Business Assistance.  Company shall provide assistance and support to Distributor from time to time in an effort to maximize Distributor's business opportunities in the resale of the Products of Company, and thereby enhance Distributor's efforts to maintain and build Distributor's business in a manner that will more effectively serve and retain the good will of all dealers, purchasers and users of Products.

3.4   Review of Advertising.  Distributor acknowledges and agrees that any and all advertising materials developed by Distributor relating to the Products shall be subject to the prior approval of Company prior to use by Distributor.   Distributor agrees not to distribute or use any advertising materials which do not meet the approval of Company.  Distributor further agrees to submit samples of any and all such advertising materials to Company upon Company's request.  For purposes of this Agreement, such Distributor advertising materials include, without limitation, Distributor's Internet website, e-mail solicitations, brochures, pamphlets, catalogs, print or broadcast advertisements or related materials.

### IV.   RIGHTS, OBLIGATIONS AND RESPONSIBILITIES OF DISTRIBUTOR

4.1   Warranties and Representations of Distributor.

Distributor represents and warrants as follows:

A.   That if Distributor is a corporation, it is organized, existing and in good standing under and by virtue of the laws of the state set forth on the title page hereof;

B.   That the name of the Distributor set forth on the title page hereof is the exact name of the Distributor indicated on the public record of Distributor's state of organization.

C.   That there have been delivered to the Company by the Distributor financial statements of the Distributor, all of which have been prepared in accordance with generally accepted accounting principles consistently applied.

3

D.    That the Distributor has paid or adequately provided for any and all taxes, license fees, or other charges levied, assessed or imposed upon any of its property or income;

E.    That there are no suits, governmental proceedings or litigation pending, or to the knowledge of the Distributor, threatened against the Distributor, which may materially affect the financial condition, business, or property of the Distributor, and no strike is pending, or to the knowledge of the distributor, threatened against the Distributor by its employees or any labor union claiming to represent such employees;

F.    That the Distributor has in effect no other or prior security agreements, nor are there existing any liens or encumbrances which would take precedence or priority over those of the Company granted under the terms of this Agreement;

G.    That the Distributor has adequate facilities and personnel as necessary to meet the obligations hereby assumed;

H.    That the Distributor has sufficient net working capital as may be required to enable the Distributor properly and fully to carry out and perform all of Distributor's duties, obligations and responsibilities under this Agreement;

I.    That the Distributor has an adequate service dealer organization to perform its duties under Section 6.3; and

J.    That the Distributor is an established distributor or representative of (or otherwise engaged in the business of selling) products other than Company's Products and that its economic survival is not and will not be dependent on the distribution of Company's Products.

4.2    <u>Sales and Service Responsibility</u>. Distributor shall attain annual sales goals relative to units, replacement parts and accessories as mutually agreed to by Company and Distributor. These goals may be modified by the parties hereto from time to time. Distributor acknowledges and agrees that such goals are reasonable. Distributor shall promote, advertise, sell and service Products aggressively by all legitimate means, and in connection therewith represents that it presently does and shall continue to:

A.    Employ capable and sufficient office personnel;

B.    Employ a sufficient number of qualified sales personnel and effective sales management;

C.    Formulate comprehensive advertising and sales promotion plans which, moving forward, with respect to the Products, shall be consistent with Company's recommendations and utilize Company's prepared materials; moreover,

Distributor shall obtain approval from Company in advance of any changes therein;

D.  Maintain at all times a sufficient and representative number of Products, including spare parts and accessories, and demonstrators, with such assortment of models as necessary and appropriate for the market involved. Distributor agrees that this requirement is reasonable in light of relevant market conditions, as well as the Primary Area, and that Distributor will promptly communicate with Company in the event such market conditions change;

E.  Maintain and employ in connection with Distributor's business and operations under this Agreement, such net working capital as may be required to enable Distributor properly and fully to carry out and perform all of Distributor's duties, obligations and responsibilities under this Agreement; and

F.  Employ a Service Manager who is capable of presenting training seminars to dealers. The Service Manager is obligated to attend Company sponsored training seminars and presentations.

4.3  <u>Distributor Sales</u>. Distributor shall offer its dealers and customers such terms, discounts, and financing programs to facilitate Distributor's resale of Products, as Distributor, in its sole discretion, deems necessary and appropriate. Nothing herein shall be interpreted to in any way limit or control the resale of Products by Distributor, or the prices, terms, discounts or financing programs offered by Distributor in connection therewith.

4.4  <u>Local Taxes</u>. Distributor shall pay all taxes (except Company's income taxes), licenses, assessments, charges and liabilities of every kind whatsoever, that are based upon the sale, use or ownership of Products hereunder, or upon Distributor's right to sell or lease the same. Distributor will provide to Company appropriate resale certificates or other evidence of non-taxability of sales to Distributor as may be applicable.

4.5  <u>Product Changes by Distributor</u>. Distributor shall not alter or change any of the Products furnished hereunder, except as required by local safety laws, regulations and interpretations and specifically approved in advance by Company; shall not remove or obliterate any of the trademarks, patent numbers, name plates, or other markings thereon; and shall not do anything that would in any way impeach, or lessen the validity of the patents, trademarks or other intellectual property rights under which Products are manufactured or sold.

4.6  <u>Trademarks</u>. Distributor shall not use any trademark or trade name owned by Company, either alone or with any other word or words as part of Distributor's trade or corporate name, or in any other fashion, without the express written permission of Company, and shall not remove any such trademarks or trade names from Products. Upon request by Company, and in any event upon termination of this Agreement, Distributor agrees to immediately discontinue completely any and all use of any and all of Company's trademarks or trade names, for any purpose whatsoever, including use in Distributor's

5

trade or corporate name, Internet website, and any other advertising or other materials of Distributor. Distributor further shall prohibit the use of Company's trademarks and trade names by its dealers, or any other associated business, as part of a trade or corporate name. Upon request by Company, and in any event upon termination of this Agreement, Distributor further shall prohibit the use of Company's trademarks and trade names by its dealers, or any other associated business, as part of an Internet website, or any other advertising or other materials, except as approved in advance and in writing by Company.

4.7     <u>Financial Statements and Sales Information</u>.  Distributor shall provide to Company at least quarterly during the term of this Agreement, financial reports and shall provide such other financial data as the Company may reasonably request.  Distributor shall also provide Company with such marketing and sales data as requested by Company from time to time relating to Distributor's marketing and sales activities in connection with the Products.

4.8     <u>Distributor Not Agent</u>.  Distributor is an independent contractor in relation to the Company, solely responsible for its own acts at all times.  Distributor is not authorized to act as agent for Company and has neither the right nor authority to assume or create obligations of any kind on behalf of Company, or to accept service of legal processes of any kind addressed to or intended for Company, or to bind Company in any respect whatsoever.  The relationship between Company and Distributor is that of vendor and vendee, and not of principal and agent.

## V.     PURCHASE ORDERS, PRICES, AND TERMS OF PAYMENT

5.1     <u>Purchase Orders</u>.  All purchase orders of Distributor shall, unless otherwise agreed by Company from time to time, be in writing and set forth the quantity of the Products desired, the desired delivery date, the price of each Product, and all other relevant information necessary to effectuate shipment of the Products by Company.  It is contemplated that from time to time purchase orders, in forms prepared by Distributor or other purchasers, may be used in ordering the Products and that there may be included in such purchase orders certain stipulations, conditions, terms or agreements not otherwise contained herein.  It is expressly understood and agreed by Distributor that the provisions of this Agreement shall be deemed a part of each purchase order accepted by the Company.  Any provision in the purchase order or other forms submitted by Distributor which are inconsistent, contrary or in addition to the provisions of this Agreement shall be deemed amended or deleted as the case may be.  Specifically, all provisions on the reverse side of such purchase order or other forms shall be deemed deleted and superseded by the provisions of this Agreement.

5.2     <u>Prices and Terms of Sale</u>. Company shall establish such prices and terms of sale at which Distributor shall purchase Products from Company, as Company deems appropriate and as summarized in the Company's published Company policies as amended by Company from time to time.  Company reserves the right to, at any time, reduce or increase such prices, or to modify or discontinue any incentives, and to discontinue, change or improve

any of said Products, without accountability to Distributor in connection with Distributor's stock of unsold Products on hand.

5.3    <u>Terms of Payment</u>. Payment shall be due in accordance with terms stated on individual product invoices. A service charge will be assessed on all past due payments as specified in the Company's published policies.

5.4    <u>Acceptance of Orders</u>. All orders for Products shall be subject to acceptance by Company at 400 Oakwood Road, Lake Zurich, Illinois 60047, or at such other address as may be designated by Company from time to time. After acceptance by Company, no order may be cancelled by Distributor without the written consent of Company. Any orders accepted by Company are subject to cancellation by Company at its sole discretion.

5.5    <u>Delivery of Orders</u>. Company shall have no liability to Distributor hereunder, or under any order from Distributor, on account of delay in delivery of, or inability to manufacture or deliver any Products for any reason, including but not limited to strikes, lock-outs, accidents, fires, delays in manufacture, transportation or delivery of materials, acts of God, embargoes or governmental action, or any other cause beyond the reasonable control of Company, whether the same or different from the matters and things hereinbefore specifically enumerated.

## VI.   <u>WARRANTY AND SERVICING</u>

6.1    <u>Warranty</u>. All Products sold to Distributor pursuant to this Agreement are sold subject to the standard warranty of the Company as may be in effect from time to time, and Distributor is not authorized to assume on behalf of Company any other obligation or liability in connection with the sale of Products except as specifically approved in writing by the Company. In the event that any changes or alterations are made in the Product, except as may be required by local safety laws, regulations or interpretations, or if Distributor authorizes or encourages application or use of a Product inconsistent with its specifications or Company's recommendations; then, the warranty of the Company shall forthwith terminate and Distributor shall indemnify Company for, and hold it harmless against and from any liability to any customer of Distributor or of Distributor's dealers in connection with the sale or use thereof, including liability for personal injury, property damage or monetary loss, including any and all costs incurred as a result of defending any suit or action as may be reasonably required.

6.2    <u>LIMITATION OF LIABILITY, REMEDIES AND DAMAGES</u>. THE SOLE RESPONSIBILITY AND LIABILITY OF COMPANY AND THE MANUFACTURER OF THE PRODUCTS INCURRED BY OR ARISING OUT OF OR WITH RESPECT TO THIS AGREEMENT, THE SALE AND OPERATION OF THE PRODUCTS, COMPANY'S RELATIONSHIP WITH DISTRIBUTOR, OR COMPANY'S OR THE MANUFACTURER'S SUPPLY OF EQUIPMENT, SPARE PARTS OR SERVICES, AND THE EXCLUSIVE REMEDY OF DISTRIBUTOR (OR ANYONE CLAIMING RIGHTS THROUGH OR ON BEHALF OF DISTRIBUTOR) AGAINST COMPANY

OR THE MANUFACTURER UNDER THIS AGREEMENT, ANY WARRANTY, OR OTHERWISE SHALL BE LIMITED TO THE REPAIR OR REPLACEMENT, AT COMPANY'S OPTION, OF PRODUCTS OR PART(S) NOT CONFORMING TO THE WARRANTY OR, IF DEEMED NECESSARY IN THE REASONABLE JUDGMENT OF COMPANY AND AT COMPANY'S OPTION, THE REMOVAL OF THE PRODUCTS (SUBJECT TO DISTRIBUTOR'S PRIOR SATISFACTION AND DISCHARGE OF ALL LIENS AND ENCUMBRANCES AND WITH DISTRIBUTOR'S FULL COOPERATION AND ACCESS) AND THE RETURN TO DISTRIBUTOR OF MONIES ACTUALLY PAID TO COMPANY IN CONNECTION WITH THE PURCHASE OF THE PRODUCTS, WITHOUT INTEREST, LESS AN AMOUNT EQUAL TO THE DEPRECIATION IN VALUE OF THE PRODUCTS INCURRED DURING DISTRIBUTOR'S POSSESSION OR USE OF THE PRODUCTS. COMPANY SHALL BE RESPONSIBLE FOR THE EXPENSE OF PHYSICALLY REMOVING THE PRODUCTS. THE TOTAL LIABILITY OF COMPANY AND THE MANUFACTURER SHALL IN NO EVENT EXCEED THE AMOUNT ACTUALLY PAID TO COMPANY BY DISTRIBUTOR WITH RESPECT TO THE PRODUCT OR SERVICE, IF ANY, WHICH GAVE RISE TO THE CLAIM, LOSS OR DAMAGE. IN NO EVENT SHALL COMPANY OR THE MANUFACTURER BE LIABLE TO DISTRIBUTOR, ITS ASSIGNS OR AGENTS (OR ANYONE CLAIMING ON BEHALF OF OR THROUGH ANY OF THEM), FOR ECONOMIC LOSS, COMPENSATORY, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, ARISING IN CONTRACT, STRICT LIABILITY OR IN TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE) AT EQUITY OR AT LAW, INCLUDING BUT NOT LIMITED TO, ANY DAMAGES FOR LOST PROFITS OR FAILURE TO MEET DISTRIBUTOR'S SALES CONTRACTS. THIS LIMITATION OF REMEDIES HAS BEEN NEGOTIATED BY COMPANY AND DISTRIBUTOR, IS REASONABLE TO ENABLE DISTRIBUTOR TO RECEIVE THE BENEFIT OF A LOWER PURCHASE PRICE THAN WOULD APPLY IN THE ABSENCE OF SUCH LIMITATION, IS DEEMED TO BE ADEQUATE BY BOTH PARTIES, AND IS INTENDED BY THE PARTIES TO SURVIVE EVEN IF THE REMEDY IS CLAIMED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE. DISTRIBUTOR'S FULL AND COMPLETE PERFORMANCE OF ALL OBLIGATIONS OF DISTRIBUTOR RECITED IN THIS AGREEMENT IS A CONDITION PRECEDENT TO ANY OF COMPANY'S WARRANTY OBLIGATIONS AND LIABILITIES RECITED HEREIN. COMPANY SHALL BE UNDER NO OBLIGATION TO PERFORM UNDER ANY WARRANTY CLAIM UNTIL COMPANY HAS RECEIVED PROMPT WRITTEN NOTICE FROM DISTRIBUTOR OF AN ALLEGED DEFECT AND HAS DETERMINED UPON REASONABLE INSPECTION THAT A DEFECT EXISTS.

6.3  <u>Service Dealer Organization</u>. The Distributor shall be responsible for and shall establish and develop a service dealer organization within the Primary Area which will ensure prompt and efficient servicing and distribution of spare parts for all Products. All Company servicing dealers appointed by Distributor shall agree to:

A.  Service all products presented by end-users regardless of place of purchase.

B.  Purchase special tools and service manuals as recommended by Company.

C.  Maintain a clean, safe and efficient workshop with competent personnel.

D.  Maintain an adequate stock of spare parts as recommended by Company in order to provide prompt and efficient service to customers of ECHO® products.

E.  Attend service schools as conducted by the Distributor or by Company in order to be proficient in the service of ECHO® products and to qualify for warranty labor rates as established from time to time.

F.  Process all warranty claims in accordance with the written procedures as supplied by Company.

G.  Maintain a sufficient credit rating as may be necessary to purchase and maintain a satisfactory inventory of spare parts from the Distributor.

H.  Adhere to Company's Internet sales policy as set forth in Section 1.4 as well as any and all advertising and other policies established by Company.

6.4  <u>Expenses</u>. With respect to each Product which shall fail to conform to the standards set forth in the applicable warranty, Company shall either repair or replace any part or Product pursuant to the warranty, or if the warranty servicing has been performed by Distributor or any of Distributor's dealers, reimburse Distributor for parts used at Distributor's cost and/or Distributor's labor charges in accordance with Company's published Flat Rate Schedule applicable to each Product, as established from time to time. Company reserves the right to examine or reclaim any part or Product claimed to be nonconforming or defective and which is replaced by a new part or Product.

## VII.  SECURITY AGREEMENT

7.1  <u>Security Agreement – Non-Cash Transactions</u>. The provisions of this Section 7.1 shall be applicable to all sales of the Product to Distributor which shall be on other than a cash payment basis.

A.  <u>Definition of Collateral</u>. "Collateral" as used herein shall mean all Products and any and all auxiliary equipment and accessories therefor together with all spare parts, attachments, accessories, accessions, additions, replacements, improvements, modifications and substitutions thereto or thereof, whether heretofore or hereafter acquired by Distributor, together with all proceeds (as presently or hereafter defined by the Uniform Commercial Code) thereof, including, but not limited to, cash, money, promissory notes, inventory, accounts, accounts receivable, documents, instruments, chattel paper, general intangibles, payment intangibles, contract rights, leases, lease proceeds, rental payments, license fees, trade-ins, equipment, fixtures, accessories, attachments, work in

9

process, goods, goods in transit, returned goods, and the proceeds and products of the foregoing, all as presently or hereafter defined by the Uniform Commercial Code.

B.      <u>Grant of Rights and Security Interest.</u> In order to secure the payment and performance of any and all obligations owing by Distributor to Company, now existing or hereafter arising (including any future advances or indebtedness, interest, attorneys' fees and other costs and expenses), Distributor hereby grants to Company, and Company hereby takes and retains a purchase money security interest in the Collateral. Distributor hereby appoints Company as its attorney in fact, and authorizes Company to, (i) sign/authenticate on behalf of Distributor such additional documents/records as may be required from time to time to create, amend, extend, continue, maintain or perfect the security interest described herein or otherwise granted to or retained by Company and (ii) to make/undertake any filings or registrations with governmental officials or offices and take such other actions as Company deems appropriate to perfect, amend, continue and maintain the perfection of the security interest created hereby or otherwise granted to or retained by Company. In addition, Distributor hereby ratifies any filings made against Distributor by Company prior to the date hereof. The aforesaid security interests shall secure and act as security for any and all indebtedness, liability and obligations of Distributor to Company, whether absolute, contingent, direct, indirect, liquidated or unliquidated, now existing or hereafter arising, whether or not secured by property or rights in addition to the Collateral.

C.      <u>Covenants With Respect To Collateral.</u>

       (i)      Distributor shall have the right to possession and control of the Collateral, and if the Collateral is inventory of Distributor, the right to sell and use the same in the ordinary course of business, until an act of default occurs under this Agreement, at which time Company shall be entitled to possession and control of the Collateral. Distributor shall maintain accurate records of the Collateral and, upon request by Company, furnish copies thereof to Company. Company may, from time to time, examine the books and records of Distributor with respect to the Collateral and any sales made thereof, and may, from time to time, examine the Collateral during business hours.

       (ii)      Distributor shall keep the Collateral free of all liens and encumbrances at all times, and pay, or cause to be paid, all rent due on the premises where the Collateral is or may be located. Distributor shall keep the Collateral on the premises indicated in the "Product Location" section of the title page hereof, unless Company consents in writing in advance to its removal to another location. Distributor shall protect and insure the Collateral at all times against all risks to which it is exposed with policies satisfactory to Company. Such policies shall provide for any losses to be payable to both Company and Distributor as their interests appear. Distributor hereby assumes all risks of loss from casualty or other losses.

10

(iii)    Distributor shall pay promptly when due all taxes and assessments upon the Collateral.

(iv)    Distributor warrants and represents to Company that all of the information contained on the title page of this Agreement is complete and accurate as of the date of this Agreement. Distributor also represents that, except as set forth on the title page of this Agreement, during the past (5) years, Distributor has not changed its name, state of incorporation, type of business entity, location of its principal business office, or location of the principal residence(s) of the owner(s) in the case of a proprietorship or partnership.

D.    Default. Distributor shall be in default hereunder in the event that: (i) Distributor shall fail to pay any indebtedness when due or payable or fail to perform any duty or obligation required to be performed by Distributor hereunder or under the terms of any other agreement between Distributor and Company; (ii) Distributor shall fail to pay its obligations as they become due or payable; (iii) a judgment is entered against Distributor and not vacated or fully satisfied within thirty (30) days after the date of entry; (iv) the business of Distributor is in any way liquidated, or if Distributor makes any assignment for the benefit of creditors or a petition under any chapter of any bankruptcy law is filed by or against Distributor; (v) Company deems itself insecure, or if, in the opinion of Company, any part of the Collateral is in danger of loss, misuse, seizure or confiscation; or (vi) Distributor sells, alienates or assigns a substantial portion of its assets in a transaction other than in the ordinary course of its business. Distributor's default shall not be affected or obviated in any manner by reason of any defense of setoff, abatement or recoupment, or any claim or counterclaim asserted by Distributor, including, but not limited to, any claim for breach of warranty or contract.

E.    Remedies Upon Default. In the event of a default by Distributor, in addition to all other rights and remedies provided herein and/or by applicable law, Company shall, if it so elects, have the following remedies, without prior notice to Distributor:

(i)    The unpaid balance of any and all indebtedness, obligations and liabilities however evidenced and secured shall be accelerated and become immediately due and payable;

(ii)    Company shall have all the rights and remedies of a secured party under the Uniform Commercial Code in effect in the State of Illinois and the state in which Distributor is located and/or the Collateral is located. Specifically, and not in limitation hereof, Company shall have the right to immediate possession of the Collateral upon demand. Company 's right to possession shall not be affected or obviated in any manner by reason of any claims asserted by Distributor of any nature whatsoever, including

specifically, but not limited to, any defense of setoff, abatement, recoupment or any claim or counterclaim, including, but not limited to, any claim of breach of warranty or contract. In furtherance thereof, Company may enter upon Distributor's premises and remove the Collateral. Further, Company may require Distributor, at Distributor's expense, to assemble the Collateral and make it available for removal by Company at a place designated by Company.

    (iii)    Upon demand by Company, Distributor shall immediately cease all use of the Collateral (and if the Collateral is inventory, refrain from any further or continuing sales thereof) and take such further actions as may be necessary to protect and save the Collateral from any further depreciation or decline in value. Distributor shall hold the Collateral for disposition in accordance with Company's instructions.

## VIII. TERM AND TERMINATION

8.1    <u>Term</u>. THIS AGREEMENT SHALL TAKE EFFECT ON THE COMMENCEMENT DATE AS SET FORTH ON THE TITLE PAGE HEREOF AND SHALL CONTINUE IN FULL FORCE AND EFFECT UNLESS TERMINATED AS PROVIDED HEREIN.

8.2    <u>Termination</u>. This Agreement may be terminated as follows:

    A.    By Distributor with or without cause upon a minimum of sixty (60) days advance notice in writing;

    B.    By Company with or without cause upon a minimum of sixty (60) days advance notice in writing.

    C.    By Company immediately upon giving written notice, in the event that:

        (i)    There are instituted proceedings by or against Distributor in bankruptcy or under insolvency laws for corporation reorganization or receivership or dissolution which are not vacated within thirty (30) days from the date of filing;

        (ii)    Distributor makes an assignment of all or part of its assets for the benefit of creditors;

        (iii)    Distributor, or if a partnership, or any partner of Distributor shall admit insolvency;

        (iv)    Distributor, if a corporation, ceases to exist;

        (v)    Distributor is a partnership or a corporation and disagreements arise between the members of the partnership or the stockholders, officers, or

12

managers of the corporation which cause Company to deem that its interests may be imperiled;

(vi)    Distributor or any officers, principal stockholder or manager, or partner is indicted for or convicted of any felony or converts or embezzles any property or funds of others;

(vii)   There is a death, removal, resignation, withdrawal or elimination from Distributor of any person named on the title page hereof as a "Principal Representative of Distributor";

(viii)  A misrepresentation is made to the Company as to the ownership of Distributor;

(ix)    Sale, transfer or relinquishment of any substantial interest in the ownership or active management of Distributor, or attempted assignment of this Agreement, shall occur without prior written approval of Company;

(x)     Distributor shall fail to cause Company to be informed in writing immediately of the happening of any event specified in this section;

(xi)    Distributor shall fail to notify Company within five (5) days after any change in Distributor's information as stated on the title page hereof, as well as details of such change; or

(xii)   There is any non-payment of bank drafts delivered by Distributor to Company in payment for Products; non-payment of any check issued by the Distributor; or Distributor becomes more than sixty (60) days in arrears in payment of its account to Company.

(xiii)  Distributor fails to comply with Company's Internet sales policy as set forth in Section 1.4 herein, if not cured by Distributor upon thirty (30) days written notice.

D.   It is understood by the parties hereto that the performance both as to the letter and the spirit of Distributor's sales and service responsibility under Section 4.2 hereof is of central and crucial importance to this Agreement. It is agreed by Distributor and by Company that unsatisfactory performance under such provision as so deemed by Company shall be sufficient basis for termination at the discretion of Company. It is further understood and agreed that no termination hereof shall affect the validity or enforceability of the security interest retained hereunder, until such time as all obligations of any payments or other terms or purchase orders, sales contracts and this Agreement are fully performed.

8.3     <u>Obligations Upon Termination.</u>

       A.     Unless otherwise required by law, upon the effective date of termination, all outstanding purchase orders shall be cancelled and Company shall have the obligation to repurchase from Distributor all or any portion of any new, undamaged, and unused Products related to the line or lines of Products terminated, which are of current manufacture, in their original containers, theretofore sold by Company to Distributor and being currently offered for sale by Company, and owned by and remaining in Distributor's inventory, at the lower of the prevailing or original purchase prices exclusive of any transportation charges originally paid by Distributor and less any non-reimbursed transportation charges originally paid by Company. After notice of termination has been given, Company shall notify Distributor regarding transition procedures or Products to be repurchased by Company.

       B.     Upon termination of this Agreement, whether with or without cause, any and all amounts owed by Distributor to Company shall immediately become due and payable and Distributor shall pay all such amounts in full to Company within ten (10) days after the effective date of termination of this Agreement.

       C.     In the event Company accepts any purchase orders from Distributor after notice of termination of this Agreement has been given, Distributor acknowledges and agrees that Company, in its sole discretion, may require that any such purchases be on a 'cash in advance' or C.O.D. terms, and Distributor agrees to comply with such terms, as such sales shall be subject to the restrictions contained in this Agreement.

       D.     Distributor is not making any capital investment in reliance upon the continuation of this Agreement or any written or oral statements by Echo. Upon any termination of this Agreement, Distributor shall have no right to receive any indemnity or compensation for loss of goodwill, reimbursement of investment or other compensation, and Distributor hereby waives any such right.

## IX.   GENERAL PROVISIONS

9.1     <u>Assignment.</u> Distributor understands and agrees that its rights under this Agreement are not transferable, and therefore cannot be considered an asset of its business, and that this Agreement may not be assigned by Distributor to any other individual or business entity without the advance written approval of Company, such approval to be at the sole discretion of Company.

9.2     <u>Notice.</u> All notices permitted or required hereunder shall be in writing, shall be executed by an officer of Company or by any executive officer, partner or principal of Distributor, and shall be effective as of the date on which deposited in the United States mails in a properly stamped and addressed envelope or sent to the other party via courier or facsimile transmission, except that any such notice actually or personally delivered to an

officer of Company, or to any executive officer, partner, or principal of Distributor shall be effective as of the date of delivery. All such notices shall be sent to the respective parties at the address set forth on the title page hereof or to such other address as may be designated by either party from time to time.

9.3    Transfer of Interest. This Agreement has been entered into in reliance upon and, in consideration of the personal qualifications and representations with respect thereto of the persons named as principal representatives of the Distributor on the title page hereof, who actively and substantially participate in the ownership or in the operations, or both, of Distributor.

9.4    Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes all previous agreements, memoranda, negotiations, or other understandings of the parties, whether written or verbal, relating to the subject matters hereof. This Agreement may be amended only by a writing signed by authorized representatives of both parties hereto.

9.5    Separability of Provisions. A judicial or administrative declaration in any jurisdiction of the invalidity of any one or more of the provisions hereof shall not invalidate the remaining provisions of this Agreement in any jurisdiction, nor shall such declaration have any effect on the validity or interpretation of this Agreement outside of that jurisdiction.

9.6    Waiver of Compliance. Any failure by any party hereto to enforce at any time any term or condition under this Agreement shall not be construed as a waiver of that party's right thereafter to enforce each and every term and condition of this Agreement.

9.7    Force Majeure. Any party hereto shall be excused from nonperformance or delay in case of force majeure, including but not limited to strikes, lock-outs, and other labor disputes, wars, revolutions, civil strikes, riots, disturbances and acts of enemies, accidents, unavailability of raw materials, typhoons, hurricanes, floods, fires, earthquakes, diseases and other like causes beyond the control of either party hereto.

9.8    Binding Upon Successors. This Agreement shall be binding upon the successors and legal representatives of the parties hereto. This Agreement may not be assigned by any party without the prior written consent of the other party hereto.

9.9    Jurisdiction and Governing Law. THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF ILLINOIS, AND SHALL BE CONSTRUED ACCORDING TO THE LAWS OF THAT STATE, WITHOUT REGARD TO CHOICE OF LAW PRINCIPLES. Distributor consents to the jurisdiction of any court of general jurisdiction located within the counties of Cook or Lake in the State of Illinois with respect to any legal proceedings arising out of this Agreement, and agrees that the mailing to its last known address by registered mail of any process shall constitute lawful and valid service of process in any such proceeding, suit or controversy. Distributor shall bring any legal proceeding arising out of this Agreement only in the federal or state

courts located in the counties of Cook or Lake in the State of Illinois. In the event Distributor institutes any legal proceedings in any other court other than those specified above, it shall assume all of the Company's costs in connection therewith, including, but not limited to, reasonable attorneys' fees.

9.10  Waiver/Trial by Jury.  TO THE FULLEST EXTENT PERMITTED BY LAW, DISTRIBUTOR HEREBY WAIVES TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT, THE PARTIES' RELATIONSHIP AND/OR THE PURCHASE, SALE, RE-SALE OR USE OF PRODUCTS.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate originals by their duly authorized representatives the date and year first set forth on the title page hereof.

COMPANY:                              DISTRIBUTOR:

ECHO, INCORPORATED                    Timberland Machines & Irrigation, Inc.

BY: _____          BY: _____

TITLE:  President                     TITLE:  CEO

DATE:  August 19, 2004                DATE:  8/10/04

*docs/distributor agreement-revised*

16











Timberland





Timberland

RHODE ISLAND

