**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ECHO, INCORPORATED., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.:  08 C 7123 |
| | ) | |
| v. | ) | Judge Charles P. Kocoras |
| | ) | |
| TIMBERLAND MACHINES & | ) | |
| IRRIGATION, INC., | ) | JURY DEMANDED |
| | ) | |
| Defendant. | ) | |

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM
OF TIMBERLAND MACHINES & IRRIGATION, INC.**

Defendant, Timberland Machines & Irrigation, Inc. ("Timberland"), hereby responds to the allegations of Plaintiff's Complaint in corresponding numbered paragraphs and asserts a counterclaim as set forth below.

**ANSWER**

1.  Plaintiff, Echo, Incorporated ("Echo") is a corporation incorporated under the laws of the State of Illinois, with its principal place of business located at 400 Oakwood Road, Lake Zurich, Illinois  60047.

**Response**.  Admitted.

2.   Defendant, Timberland Machines & Irrigation, Inc. ("Timberland") is a corporation incorporated under the laws of the State of Delaware, having its principal place of business located at One Niblick Road, Enfield, Connecticut 06082.

**Response.**  Admitted.

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) since the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00 and is between citizens of different states.  Venue is proper pursuant to 28 U.S.C. §1391.  Additionally, the Distributor Agreement (as defined herein and attached as Ex. A) executed between the parties contains a forum selection clause, at §9.9 thereof, designating this judicial district as the proper jurisdiction and venue.

**Response.**  Denied.  This matter must be litigated in the United States District Court of Connecticut.  Timberland also denies that the forum selection clause is effective as to this action.  Timberland denies the remaining allegations of Paragraph 3.

Count I
(Breach of Contract)

4.  Echo realleges and incorporates as if fully set forth herein the allegations of paragraph 1 through 3, inclusive.

**Response.**  Timberland sets forth the allegations of Paragraph 1 through 3 as if fully set forth herein.

5.  On or about August 19, 2004, Echo and Timberland entered into an Echo Distributor Sales and Service Agreement (the Distributor Agreement") concerning Timberland's purchase from Echo and resale of certain products (as defined in the Distributor Agreement, the "Products") as a non-exclusive distributor.  A copy of the Distributor Agreement is attached hereto and incorporated herein as Ex. A.

**Response.**  Timberland admits that the parties executed an agreement in August 2004 and that Echo, Inc. ("Echo") attached a copy of the agreement to the complaint. Timberland denies the remaining allegations of Paragraph 5 and that the terms of any such agreement govern the parties' relationship.

2

6. The Distributor Agreement states that "It is expressly understood and agreed by [Timberland] that the provisions of this Agreement shall be deemed part of each purchase order accepted by [Echo]. *See* Ex. A, Distributor Agreement §5.1. Additionally, the Distributor Agreement provides that "Payment shall be due in accordance with terms stated on individual product invoices." *See id*., Distributor Agreement §5.3.

**Response.** Timberland states that the terms of the agreement speak for themselves and denies that any such provisions govern the parties' relationship.

7. Between August 1, 2008 and October 31, 2008, Timberland submitted to Echo multiple purchase orders for Products (the "Purchase Orders").

**Response. Admitted.**

8. Echo accepted the Purchase Orders from Timberland, and in furtherance thereof, Echo shipped Products and issued invoices (the "Invoices") to Timberland stating the terms of payment applicable to the Purchase Orders.

**Response.** Timberland admits that it submitted purchase orders and that Echo shipped product and issued invoices. Timberland denies the remaining allegations of Paragraph 8.

9. The Invoices required Timberland to make payments in full to Echo by November 25, 2008.

**Response. Denied.**

10. Timberland failed to make the required payments due under the Invoices, and is delinquent and in arrears in the principal sum of $630,367.62.

**Response. Denied.**

11. Section 7.1(D) of the Distributor Agreement provides in pertinent part that "[Timberland] shall be in default hereunder in the event that: (i) [Timberland] shall fail to pay any indebtedness when due or payable or fail to perform any duty or obligation required to be performed by [Timberland] hereunder or under the terms of any other agreement between [Timberland] and [Echo] . . ." *See* Ex. A, Distributor Agreement §7.1(D).

**Response.** Timberland states that the terms of the agreement speak for themselves and denies that any such provisions govern the parties' relationship.

12. Echo has demanded Timberland to make payment of the delinquent balance due under the Invoices.

**Response.** Timberland admits that Echo has demanded payment. Timberland denies that any obligation to make payment exists. Timberland also denies the remaining allegations of Paragraph 12.

13. Notwithstanding such demand, Timberland failed to make payment. Echo has satisfied its obligations under the Distributor Agreement and the Purchase Orders.

**Response.** Timberland admits that it has failed to make payment because no obligation to do so exists. Timberland denies the remaining allegations of Paragraph 13.

14. As a result of Timberland's nonpayment to Echo, Timberland is in default under the Distributor Agreement.

**Response.** Denied.

15. Section 7.1(E) of the Distributor Agreement provides that "In the event of a default by [Timberland] . . . [Echo] shall, if it so elects, have the following remedies, without prior notice to [Timberland]: (i) The unpaid balance of any and all indebtedness,

obligations and liabilities however evidenced and secured shall be accelerated and become immediately due and payable . . ." *See* Ex. A, Distributor Agreement §7.1(E)(i). Notice of acceleration was provided to Timberland.

      **Response.**   Timberland states that the terms of the agreement speak for themselves and denies that any such provisions govern the parties' relationship. Timberland denies the remaining allegations of Paragraph 15.

      16.  As a result of the default by Timberland, there is due and owing from Timberland to Echo under the Distributor Agreement an accelerated indebtedness of $2,785,978.15, resulting from additional Products sold to Timberland for which payment has not been made.

      **Response.**  Denied.

      17. Consequently, the total amount due and owing from Timberland to Echo, exclusive of any applicable interest or any late fees is $3,400,306.97.

      **Response.**  Denied.

Count II
(Goods Sold and Delivered)

      18.  Echo realleges and incorporates as if fully set forth herein the allegations of Paragraph 1 through 17, inclusive.

      **Response.**  Timberland sets forth the allegations of Paragraph 1 through 17 as if fully set forth herein.

      19.  Timberland has become indebted to Echo in the amount of $3,400,306.97 by virtue of goods sold and delivered by Echo for the benefit of Timberland.

      **Response.**  Denied.

20.  No part of the amount set forth above has been paid although payment has been demanded, and there is now due and owing the principle amount of $3,400,306.97, exclusive of any applicable interest or any late fees.

**Response.**  Denied.

Count III
(Account Stated)

21.  Echo realleges and incorporates as if fully set forth herein the allegations of Paragraph 1 through 20, inclusive.

**Response.**  Timberland sets forth the allegations of Paragraph 1 through 20 as if fully set forth herein.

22.  In or about October 2008, Echo and Timberland conducted an accounting and exchanged documentation regarding the money, then-past due and owing from Timberland to Echo, being in arrears and unpaid.  Upon this accounting Timberland made a partial payment to Echo on some of the money past due and owing to Echo.

**Response.**  Timberland admits that Echo obtained documentation and that Echo attempted to review Timberland's records but denies the remaining allegations of Paragraph 22.

23.  Notwithstanding its agreement to this account stated, Timberland has refused and failed to pay the remainder of amounts past due and owed to Echo.

**Response.**  Denied.

**Affirmative Defenses**

1.  Timberland owes no obligation to pay any amounts because Echo wrongfully terminated its relationship with Timberland.

6

2.  Timberland owes no obligation to pay any amount because Echo previously had breached the agreement to the extent that it is relevant in this matter.

3.  Timberland owes no obligation to pay Echo any amount because Echo is seeking to steal from Timberland a sales network which it has developed and which has increased in value to more than $15 million.

4.  Timberland is entitled to a set-off equal to the amount of the repurchase price of any inventory returned by Timberland.

5.  Timberland owes no obligation to pay Echo any amount because Echo failed to mitigate its damages.

WHEREFORE, Timberland prays that the Court:

1.  Enter judgment in favor of Timberland and against Echo on Count I;

2.  Enter judgment in favor of Timberland and against Echo on Count II;

3.  Enter judgment in favor of Timberland and against Echo on Count III;

4.  Award Timberland its costs, which include attorneys' fees; and

5.  Award such other and further relief which the Court deems appropriate.

## **COUNTERCLAIM**

Plaintiff, Timberland Machines & Irrigation, Inc. ("Timberland"), hereby files this Counterclaim to recover more than $15 million in damages resulting from Defendant, Echo, Incorporated's ("Echo's"), breach of a franchise agreement without cause.  Plaintiff also is seeking recovery under the Connecticut Unfair Trade Practices Act.

## THE PARTIES

1.     Timberland is a Delaware corporation with a principal place of business located at One Niblick Road, Enfield, Connecticut.

2.      Echo is an Illinois corporation with a place of business located at 400 Oakwood Road, Lake Zurich, Illinois.

THE ALLEGATIONS

3.      Echo and Timberland entered into an agreement on August 10, 2004. A true and accurate copy of the agreement is attached as Exhibit A.

4.      Thereafter, Timberland acted as an Echo franchisee as to sale of that company's products.

5.      Timberland's sales area included Connecticut, Vermont, New Hampshire, Massachusetts, Maine, Rhode Island, and New York.

6.      Since the date of agreement, Timberland has increased Echo sales in that region to an annual total of more than $16 million.

7.      Timberland has done so by arranging for the sale of Echo products to various dealers of lawn and garden equipment and other retailers.

8.      Timberland also has arranged for Echo products to be sold through Home Depot. Such sales amount to more than $15 million annually.

Echo's Termination of Its Relationship with Timberland

9.      On October 21, 2008, Echo forwarded a notice terminating its relationship with Timberland. A true and accurate copy of the notice is attached as Exhibit B.

10.     Echo forwarded this notice just fifteen days following the announcement of the appointment of Daniel Obringer as President of Echo, Inc. on October 6, 2008.

11.     Mr. Obringer, who previously had acted as Echo's CFO, had expressed in the past displeasure with Timberland for no apparent reason.

12.     The individual then acting as Echo's vice president of sales, Michael Best, previously had dismissed Mr. Obringer's comments.

13.     Timberland's performance had been superb.  It proved to be highly effective as to servicing Echo and arranging for the sale of its products.

14.     Accordingly, the past Presidents never terminated the relationship with Timberland.  Indeed, no reason to do so existed.

<u>The Impact of the Termination on Timberland</u>

15.     As a result of Echo's termination, Timberland has lost more than a significant portion of its revenue.

16.     It earned more than $3.8 million in gross profits per year through its sale of Echo products.

17.     The termination of the contract and the loss of income have created irreparable harm to Timberland.

<u>Timberland Acted as a Franchisee</u>

18.     The actions of Echo and Timberland demonstrate and confirm that Timberland acted as franchisee and that Echo wrongfully terminated the relationship because no cause to do so existed.

19.     Echo maintained with Timberland a structured program into and from which Echo placed and removed its products.

20.     Echo prescribed the manner in which Timberland could market, offer, sell and/or distribute Echo products and also controlled issues relating to inventory, training, pricing, staffing, marketing, advertising, warehousing facilities, computer systems and also exerted control over a substantial part of Timberland's overall business practices.

<u>Echo's Control of Business Plans</u>

21.     In accordance with Echo's instructions, Timberland prepared draft business plans most recently using software provided by Echo.

22.     The draft plans were then reviewed by all members of the Echo management team and a meeting was held with Timberland, after which the plans would be revised and returned to Timberland.

23.     The business plans addressed numerous issues, including, among other things, targeted accounts, promotion programs, sales forecasts, training plans, inventory plans, staffing, market penetration, sales growth, marketing, spending, investment in software, order fulfillment rates, and sales programs.

24.     Echo continuously monitored and directed Timberland to adhere to the requirements of the relevant business plan.

(i) <u>Sales and Marketing</u>

25.     As part of its control over the business plan, Echo mandated sales goals for Timberland and controlled the marketing of Echo products by prescribing a marketing plan for Timberland.

26.     At various times, Echo threatened to impose punitive measures if Timberland did not meet the mandated sales goals.

27.     At various times, Echo instituted corrective measures to improve Timberland's sales performance.

(ii) <u>Advertising</u>

28.     Echo issued much of the advertising used by Timberland. Examples of such advertising are attached as Exhibit C.

29.     Echo required that all advertising suggested by Timberland be reviewed and approved by Echo prior to its use.

30.     Echo mandated that its products be displayed in a certain fashion at relevant dealers to enhance sales.

(iii) <u>Pricing</u>

31.     Echo controlled Timberland's pricing of Echo products by setting the prices at which products could be sold to national entities.  A true and accurate copy of a document implementing that order is attached as Exhibit D.   Timberland had no right to vary those prices.

32.     Echo also controlled pricing of products to be sold to dealers by forwarding Timberland a list of prices which it was to propose to dealers.  A true and accurate copy of this listing is attached as Exhibit E.

33.     At all times, Timberland adhered to the price lists provided by Echo and attempted to cause buyers to purchase the products pursuant to the direction provided by Echo.

34.     Echo also proposed sales prices for use by dealers or other entities for the resale of Echo products.  A true and accurate copy of this listing is attached as Exhibit F.

35.     With respect to products purchased by Timberland from Echo, Echo set the purchase price for all such products and such purchase prices were non-negotiable.

36.     By virtue of setting non-negotiable prices with respect to Timberland, and by mandating Timberland's resale prices, Echo controlled the pricing of goods which Timberland sought to sell, thereby maximizing Echo's own sales and revenue.

(iv) <u>Personnel and Training</u>

37.     Echo also controlled personnel decisions by dictating the number of sales agents working in the sales area, monitoring the agents' performance, noting their deficiencies, and, from time to time, requesting new representatives.

38.     Echo controlled the training of Timberland personnel by requiring Timberland sales personnel to attend training sessions at Echo facilities on a regular basis and by providing on-site training of Timberland personnel.

39.     Echo also required that Timberland provide training to dealers purchasing Echo products.  The individual designated by Timberland to conduct such training was trained by Echo at an Echo facility.

40.     Echo also mandated that all dealers purchasing Echo products receive training each year.  A true and accurate copy of an Echo directive to this effect is attached as Exhibit G.

(v) <u>Inventory</u>

41.     Echo also possessed significant control over Timberland's inventory and inventory purchasing process.

42.     Echo delivered inventory to Timberland which it felt needed to be sold pursuant to the business plan which Echo had implemented, monitored and controlled.

43.     On several occasions, Echo told Timberland that it needed to receive and sell a certain amount of inventory which Timberland had no option other than to receive and then attempt to sell.

(vi) <u>Financial Statements</u>

44.     Echo received and reviewed financial statements from Timberland on a regular basis, and, from time to time, requested and received other financial information from Timberland.

45.     Echo also had the right to audit Timberland's books if it desired to do so.

46.     Echo personnel visited Timberland's premises numerous times each year to inspect the facility, address marketing and sales issues, and to conduct training.

<u>Timberland Had Been Substantially Associated With Echo</u>

47.     The operation of Timberland's business had been substantially related to Echo.

48.     Timberland earned more than a significant portion of its revenue and gross profit from Echo.

49.     Timberland also distributed publications specific to Echo and published by Echo.   True and accurate copies of examples of such publications and promotional materials are attached as Exhibits H and I.

50.     Such materials included a Master Product Catalog.   A true and accurate copy of several pages of the catalog is attached as Exhibit J.   The front cover of the catalog displays Echo's web site address.   Only Echo had responsibility as to internet sales.

51.     Timberland also sold a credit card specific to Echo.   A true and accurate copy of material relevant to the credit card is attached as Exhibit K.

52.     Timberland also represented to dealers that it had a relationship with Echo pursuant to which it sold Echo products.

53.     Essentially all of the material used by Timberland indicated that it had been published by Echo.

54.     Timberland also was the only entity which sold Echo products to dealers in the sales area.  Accordingly, dealers viewed Timberland as Echo.

55.     Timberland also used the Echo name, logo and trademark in connection with its sales.

56.     Timberland also escorted the president of Echo on a tour of various dealerships in the Timberland sales area.  The president spoke with the leaders of these dealerships and reviewed the dealerships' presentation of Echo equipment.

<u>Echo Caused Timberland to Make Capital Investments to Service Echo</u>

57.     In 2005, Echo also required Timberland to purchase a new warehouse in Windsor, Connecticut.

58.     Shipping goods to the warehouse located in Windsor, Connecticut verses Lancaster, New Hampshire, the location of Echo's other warehouse, would reduce Echo's freight costs and thus reduce its expenses.

59.     Accordingly, Timberland obtained a warehouse in 2005 at a price of more than $1.5 million.

60.     Echo also caused Timberland to purchase a computer system at a cost of more than $1 million.

61.     Echo did so to cause its and Timberland's system to be compatible.

<u>Echo Did Not Possess Good Cause to Terminate Timberland.</u>

62.     Timberland was a leading franchisee of Echo.

63.     Timberland increased Echo sales to a point exceeding those of fellow franchisees.  Annual sales totaled more than $16 million.

64.     Timberland won the award as the leading Echo sales franchise most recently in 2005.

65.     Timberland paid all invoices to Echo as agreed.

66.     Timberland also satisfied all other requirements relevant to the parties' relationship.

67.     Timberland acted as a stellar performer.

68.     No good cause existed to terminate Timberland.

## COUNT I
## (Violation of Connecticut Franchise Act by Echo)

69.     Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 68 as if fully set forth herein.

70.     Timberland was granted the right to offer, sell and distribute Echo products in accordance with marketing and business plans prescribed by Echo.

71.     The operation of Timberland's business pursuant to such marketing and business plans was associated with Echo's name, trademark, logo, and advertising materials.

72.     Timberland complied with all material and reasonable obligations imposed by Echo on the conduct of Timberland's business.

73.     Echo terminated Timberland.

74.     No good cause existed for the termination.

75.     As a result of Echo's improper termination of Timberland, Timberland has suffered or will suffer damages exceeding $15 million.

## COUNT II
## (<u>Violation of Connecticut Unfair Trade Practices Act by Echo</u>)

76.     Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 75 as if fully set forth herein.

77.     Echo is a person subject to the requirements of the Connecticut Unfair Trade Practices Act.

78.     Echo's conduct as aforesaid constitutes conduct in violation of the Connecticut Unfair Trade Practices Act, C.G.S. § 42a-110a, *et seq.*, in that it offends public policy and/or is immoral, unethical, oppressive or unscrupulous and/or has caused substantial injury to consumers, competitors or other businesses.

79.     Echo engaged in such acts and practices intentionally and with the intention to harm Timberland.

80.     Echo's conduct, as set forth above, was engaged in as part of Echo's trade or business.

81.     As a result of Echo's unfair and deceptive conduct, as set forth above, Timberland has been severely damaged and has suffered an ascertainable loss, in an amount to be determined at trial.

82.     By virtue of the foregoing, Timberland is entitled to recover not just compensatory damages, but also punitive damages and attorneys fees and costs, pursuant to C.G.S § 42a-110b.

83.     A copy of this claim, as set forth in an action commenced in the District of Connecticut, has been sent, via certified mail, to the Attorney General of the State of Connecticut.

**COUNT III**
**(Unjust Enrichment Against Echo)**

84.     Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 83 as if fully set forth herein.

85.     Echo's termination of Timberland will permit Echo to obtain the benefit of the increased sales which Timberland's efforts have caused.

86.     As a result, Echo will unjustly receive the benefit of such sales.

87.     Timberland has been damaged in an amount exceeding $15 million.

**COUNT IV**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing by Echo)**

88.     Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 87 as if fully set forth herein.

89.     Through its improper and unjustified termination of Timberland, Echo breached the implied covenant of good faith and fair dealing contained in the relevant contract.

90.     Echo did so to steal the increased sales generated by Timberland.

91.     As a result, Timberland suffered damages exceeding $15 million.

WHEREFORE, Timberland prays that the court:

1.   Enter judgment in favor of Timberland and against Echo on Count I in an amount to be determined at trial;

2.   Enter judgment in favor of Timberland and against Echo on Count II in an amount to be determined at trial and award Timberland recovery of its attorneys' fees;

3.   Enter judgment in favor of Timberland and against Echo on Count III in an amount to be determined at trial;

4.   Enter judgment in favor of Timberland and against Echo on Count IV in an amount to be determined at trial;

5.   Award Timberland punitive damages;

6.   Award Timberland interest and its costs, which include attorneys' fees; and

7.   Award such other and further relief as the Court deems appropriate.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

Respectfully submitted,

TIMBERLAND MACHINES AND
IRRIGATION, INC.

By: /s/ Suzanne E. Rollier
        One of Its Attorneys

Martin G. Durkin
Jerry Kokolis
Suzanne E. Rollier
Holland & Knight LLP
131 S. Dearborn St., 30th Floor
Chicago, Illinois 60603
T: (312) 263-3600
F: (312) 578-6666

Dated:  December 31, 2008

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on **December 31, 2008**, she caused the foregoing **Answer, Affirmative Defenses and Counterclaim** to be filed electronically and that service was accomplished pursuant to the CM/ECF for filing users and that non-participants were served as required by L.R. 5.5.


___/s/ Suzanne E. Rollier___


Martin G. Durkin
Suzanne E. Rollier
HOLLAND & KNIGHT LLP
131 S. Dearborn Street
30th Floor
Chicago, IL 60603
(312) 263-3600


# 5930642_v1