UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ECHO, INCORPORATED, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TIMBERLAND MACHINES & IRRIGATION, INC., | ) | 08 C 7123 |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | Consolidated with |
| ______________________________ | ) | |
| TIMBERLAND MACHINES & IRRIGATION, INC., | ) | 09 C 2673 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LAWN EQUIPMENT PARTS COMPANY, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This case comes before the court on three motions. First, Plaintiff/Counter-Defendant Echo, Incorporated moves for summary judgment on Count III of its Complaint and Count I of the Counterclaim filed by Defendant/Counter-Plaintiff Timberland Machines & Irrigation, Inc. Second, Echo, Incorporated also moves to strike certain portions of the affidavits and exhibits submitted by Timberland Machines

& Irrigation, Inc. in opposition to the motion for summary judgment. Finally, Third-Party Defendant Lawn Equipment Parts Company asks that we grant its motion for summary judgment on Counts V, VI, and VII of Timberland's complaint. For the reasons set forth below, Echo's motion for summary judgment is granted and its motion to strike is granted in part and denied in part. LEPCO's motion for summary judgment is granted.

## BACKGROUND

Defendant/Counter-Plaintiff Timberland Machines & Irrigation, Inc. ("TMI") is a Delaware corporation whose principal place of business was located in Enfield, Connecticut. Mark Zeytoonjian served as President and Secretary of the company. TMI operated as two divisions: the Timberland Machines division acted as a distributor of outdoor power equipment while the Sprinkler House division was principally involved in the distribution of irrigation equipment.

On August 1, 2004, TMI entered into a Distributor Agreement with Plaintiff/Counter-Defendant Echo, Incorporated ("Echo"). Echo is an Illinois-based supplier of outdoor power equipment products. Under the Distributor Agreement, TMI acted as a distributor of Echo equipment within a defined territory that included Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont, and portions of New York. The mechanics of the distributorship remained the same from the

time the Distributor Agreement was signed in August 2004 until its termination in October 2008. Each month, TMI submitted purchase orders to Echo for Echo-brand products. Echo accepted the orders and subsequently issued invoices to TMI for payment. Echo had a practice of charging interest as late charges on all past due balances owed from TMI to Echo; the rate charged consisted of the prime rate of interest plus 4%.

Though connected to Echo by nature of their agreement, TMI maintained its own identity apart from its relationship with Echo. TMI did not use the Echo name or Echo trademarks as part of its company or trade name. Nor did TMI employ Echo's name on its stationery or when answering the telephone. TMI's personnel generally did not carry business cards containing the Echo name, trademarks, or logo when dealing with dealers and customers.[1] TMI also acted as a distributor for a number of other suppliers including Exmark, Billy Goat, MTD/White Outdoor, Columbia, Snow Ex, Kipor Generators, Yamaha Generators, Brown, and Oregon Forestry. As a distributor with many suppliers, TMI promoted Echo products in much the same way as it promoted goods from other manufacturers. TMI exhibited Echo displays in its facilities but also

---

[1] For a limited a period, a few Timberland service representatives that supported Echo's sales to Home Depot carried a separate business card bearing the Timberland Machines name and both the Timberland Machines and Echo logos for use only when they visited Home Depot locations.

exhibited similar materials from other manufacturers such as Exmark and Billy Goat and did not feature one supplier's display at the expense of others. Though TMI staff would occasionally wear clothing bearing Echo's name, they also dressed in apparel containing the brand of TMI's other suppliers just as often. TMI sent out Echo product literature but also circulated other manufacturers' literature with the same relative frequency.[2]

TMI's financial statements also speak to the character of the relationship between the two companies. From 2004 to 2008, TMI's total gross sales of Echo products were continually outpaced by its sales of goods from another manufacturer, Exmark. Echo product sales only comprised 30 to 35 percent of TMI's total business during the relevant time period. An analysis of TMI's gross profits reveals a similar pattern. Gross profits derived from Exmark goods exceeded the portion of gross profits attributable to sales of Echo products each year from 2004 to 2008. The percentage of TMI's total gross profits coming from Echo sales ranged from 29.69% in 2006 to 34.54% in 2008.

---

[2] TMI identified one exception to its largely equal distribution of its suppliers' product literature. Mark Zeytoonjian averred that TMI distributed Echo's product catalogue to every landscape contractor within its sales area on an annual basis and that TMI did not perform this service for its other manufacturers.

Although the relationship between TMI and Echo proceeded smoothly initially, by August 2008 Echo decided to terminate the Distributorship Agreement with TMI because of issues with the distributor's business model and its debt burden. Echo provided TMI with written notice of the Distributor Agreement's termination on October 21, 2008; the termination became effective on December 21, 2008. After receiving notice of termination from Echo, TMI failed to pay Echo any of the invoices due by November 25, 2008.

After making the decision to terminate TMI, Echo contacted Jeff Clark, the President of Third-Party Defendant Lawn Equipment Parts Company ("LEPCO"), to ask whether he would be interested in assuming the sales responsibilities in TMI's sales territory. At Echo's request, LEPCO met with Echo representatives on September 30, 2008, to discuss LEPCO's ability to assume responsibility for the additional territory. As a result of those discussions, Echo decided to transfer responsibilities for distribution of its products in TMI's former sales territory to LEPCO.

On December 11, 2008, Echo filed suit against TMI asserting causes of action for breach of contract, goods sold and delivered, and an account stated claim. Echo seeks damages in the amount of an unpaid sum owed to Echo by TMI plus interest. On December 31, 2008, TMI filed its answer and asserted a number of counterclaims against Echo. Count I of the Counterclaim asserts that Echo terminated the Distributor

Agreement with TMI in violation of the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133f. On December 23, 2008, eight days before filing its Answer to Echo's Complaint, TMI filed suit against LEPCO. In its Complaint against LEPCO, TMI asserts claims for tortious interference with contract, unjust enrichment, and a cause of action under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

Echo now moves for summary judgment on Count III of its Complaint as well as Count I of TMI's Counterclaim. Echo also moves to strike various affidavits, exhibits, and statements of fact submitted by TMI. LEPCO moves for summary judgment on Counts V, VI, and VII of TMI's Complaint against it.

**LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for

trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

We will address Echo's motion to strike first before turning to the motions for summary judgment submitted by Echo and LEPCO.

### I. Echo's Motion To Strike

Echo asks that we strike paragraphs 16 through 108 of Mark Zeytoonjian's affidavit because they offer improper expert testimony.[3] Federal Rule of Evidence 701 sets out the parameters of permissible lay opinion testimony:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

[3] The motion to strike targeted a number of affidavits, exhibits, and statements of fact submitted by TMI. The majority of the motion concerned evidence and factual statements that ultimately proved irrelevant to our analysis of Echo's motion for summary judgment. Accordingly, we discuss only those portions of the motion to strike that bear on our assessment of the motion for judgment as a matter of law. The remaining parts of the motion to strike are denied as moot.

Fed. R. Evid. 701. "Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002).

Echo contends that the challenged portions of Mark Zeytoonjian's affidavit constitute expert testimony because they rely on technical knowledge of accounting and legal principles in formulating their opinions. In the paragraphs at issue, Mark Zeytoonjian states that TMI's consolidated income statements for the years at issue do not accurately reflect the total sales and gross profits that were attributable to sales of Echo products. Mark Zeytoonjian explains how he utilized TMI's financial statements to arrive at what he describes as the correct amounts for those figures. A brief examination of Zeytoonjian's statements reveals that he made a number of interpretive decisions in performing his analysis, including, but not limited to: (1) excluding certain expenses associated with TMI's Sprinkler House division from his gross profits and total sales calculations because that segment of TMI's business had not been profitable during the relevant time period; (2) deducting a portion of TMI's freight costs from the gross profits attributable to Echo; (3) adding the commissions received by TMI for facilitating Home Depot purchases of Echo equipment directly from Echo to TMI's total

sales figure; and (4) including sales attributable to Bear Cat, a company acquired by Echo in 2006, in the total sales figure.

The opinions expressed in Mark Zeytoonjian's sworn statements fall outside the boundaries of lay opinion testimony. A layperson lacking knowledge of accounting principles could not arrive at such complicated determinations as Zeytoonjian made in his affidavit. For example, training in financial accounting would be required to determine whether commissions for facilitating a third party's purchase of a supplier's products directly from the manufacturer should be included in the distributor's total sales figure for that supplier. To admit Zeytoonjian's analysis as lay opinion testimony would circumvent the restrictions on expert testimony set forth in the Federal Rules of Evidence. *See* Fed. R. Evid. 701 advisory committee's note (Rule 701 designed to prevent avoidance of Rule 702's reliability requirements by "proffering an expert in lay witness clothing"). TMI did not disclose Mark Zeytoonjian as an expert before the deadline set forth in the discover schedule. Even if they had complied with the discovery schedule, we have no basis to conclude that Mark Zeytoonjian possesses the requisite qualifications to testify as an expert in financial accounting. We therefore grant Echo's motion to strike paragraphs 16-108 of Mark Zeytoonjian's affidavit. As a consequence of our ruling on the motion to strike, we did not consider any of TMI's

statements of fact or its responses to Echo's statements of fact that relied on the stricken portions of Mark Zeytoonjian's affidavit.

**II. Echo's Motion For Summary Judgment**

Echo asks that we grant it judgment as a matter of law on its accounted stated claim under Illinois Law asserted in Count III of its Complaint. Echo also requests summary judgment on TMI's claim under the Connecticut Franchise Act ("CFA") asserted in Count I of TMI's Counterclaim.

**A. Count III of Echo's Complaint - Account Stated**

Echo contends that it is entitled to judgment as a matter of law on the account stated claim because TMI admits the debt it owes Echo arising from certain unpaid invoices. Under Illinois law, an account stated claim consists of "an agreement between parties who have had previous transactions that the account representing those transactions is true and that the balance stated is correct, together with a promise, express or implied, for the payment of such balance." *W.E. Erickson Constr. v. Congress-Kenilworth Corp.*, 477 N.E.2d 513, 519 (Ill. App. Ct. 1985). In this case, Echo and TMI have reached an express agreement that TMI owes a balance of $1,607,092.77 to Echo as a result of TMI's failure to pay any of the invoices, including past-due invoices, due for payment on November 25, 2008. Accordingly, we award the principal balance to Echo by nature of the agreement between the parties. Echo also

asks for $215,152.30 in interest on the principal as a late fee. TMI does not dispute that late fees are owed and we will award Echo the requested fees on that basis. Absent any factual dispute as to the amount owed by TMI, we grant Echo's motion for summary judgment as to their account stated claim.[4]

**B. Count I of TMI's Counterclaim - Connecticut Franchise Act**

Echo also asks that we grant summary judgment in its favor on TMI's claim under the CFA because TMI has not presented enough evidence to create a triable issue of fact regarding the existence of a franchise relationship with Echo. Under the CFA, a franchisor may not terminate, cancel, or fail to renew a franchise agreement with a franchisee without good cause for doing so. Conn. Gen. Stat. § 42-133f(a). The CFA's protections only apply to business relationships that fall within the statute's definition of a franchise listed in Conn. Gen. Stat. § 42-133e(b). In order for a plaintiff to establish the existence of a franchise arrangement with the defendant, the plaintiff's business must be "substantially associated with the [defendant's] trademark[.]" Conn. Gen. Stat. § 42-133e(b)(2). The plaintiff's business need not be exclusively or completely associated with the defendant to establish a franchise. *Hartford Elec. Supp. Co. v. Allen-*

---

[4] TMI devotes three sentences of its response brief to its argument that Echo cannot recover for the unpaid invoices because it breached the Distributor Agreement. The Seventh Circuit has held that such underdeveloped arguments are waived. *Otto v. Variable Annuity Life. Ins. Co.*, 134 F.3d 841, 855 (7th Cir. 1998) (argument raised in three sentences is waived). As a result of the perfunctory nature in which it was raised, we refrain from considering TMI's contention here.

*Bradley Co., Inc.* 736 A.2d 824, 837 (Conn. 1999). Courts examine two factors when assessing whether a plaintiff is substantially associated with defendant: (1) the plaintiff's use of the defendant's name, logo, and trademark; and (2) the percentage of the plaintiff's sales of defendant's products. *Id*. at 839. A plaintiff must derive at least one half of its total sales or gross profits from sales of the defendant's products in order for a court to find a substantial association between the parties. *Id*. at 839 (substantial association when one half of total sales attributable to sales of defendant's products); *Muha v. United Oil Co., Inc.*, 433 A.2d 1009, 1011 (Conn. 1980) (no substantial association when most of plaintiff's gross profits derived from sources other than sales of defendant's product); *see also Contractors Home Appliance, Inc. v. Clarke Distrib. Corp.*, 196 F. Supp. 2d 174, 180 (D. Conn. 2002) ("a showing that the putative franchisor's products account for most or all of the franchisee's business" required to show substantial association under CFA).

Echo argues that TMI has not produced enough evidence to create a triable issue of fact regarding a substantial association between the two companies. The undisputed facts demonstrate that sales of Echo products constituted 30 to 35 percent of TMI's total sales from 2004 to 2008. Similarly, the undisputed facts show that Echo products never accounted for 50% or more of TMI's gross profits over the life of the Distributor Agreement. Nor has TMI marshaled any admissible evidence to challenge Echo's

evidence that TMI derived more of its gross profits and total sales from its relationship with another company, Exmark, than from its association with Echo. Though TMI certainly utilized Echo's trademark as part of its efforts to satisfy its obligations under the Distributorship Agreement, the use of a defendant's marks alone does not establish a substantial association between them. *See Hartford Elec. Supp. Co.*, 736 A.2d at 839 (finding substantial association based on plaintiff's use of defendant's mark and sales of defendant's products accounted for one half of plaintiff's total sales). In the absence of any admissible evidence to suggest that TMI depended on sales of Echo products for most of its business, we find no genuine issues of fact with respect to the presence of a substantial association between Echo and TMI. The lack of a substantial association between the two parties precludes TMI from establishing a franchise relationship with Echo and, consequently, from maintaining an action under the CFA as a matter of law. Accordingly, Echo's motion for summary judgment on Count I of TMI's Counterclaim is granted.

**III. LEPCO's Motion For Summary Judgment**

LEPCO moves for summary judgment on TMI's claims for tortious interference with contract, unjust enrichment, and for violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). TMI predicates its claim for violation of CUTPA on LEPCO's alleged tortious interference with the Distributor Agreement between Echo

and TMI. Accordingly, we will consider the merits of LEPCO's motion as to the tortious interference and CUTPA causes of action in the same subsection before turning to the remaining claim for unjust enrichment. For the reasons expressed in our earlier opinion in this matter, we will utilize the common principles embraced by both Illinois and Connecticut law in assessing TMI's tortious interference and unjust enrichment claims. *Echo, Inc. v. Timberland Machines & Irrigation, Inc.*, 2009 U.S. Dist. LEXIS 75889, at *7-8 (N.D. Ill. Aug. 26, 2009).

### A. Counts V and VII of TMI's Complaint - Tortious Interference With Contract and Violation of CUTPA

LEPCO argues that summary judgment is appropriate both on TMI's tortious interference with contract claim and the CUTPA claim based on the same allegations because TMI has not come forward with any evidence that LEPCO engaged in wrongful conduct to induce Echo to breach the Distributorship Agreement. To establish a tortious interference with contract claim, both Connecticut and Illinois law require that the plaintiff demonstrate that the defendant's alleged wrongful conduct caused a third party to breach its contract with the plaintiff. *See Solomon v. Aberman*, 493 A.2d 193, 196-97 (Conn. 1985); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 545 N.E.2d 672, 676 (Ill. 1989). The undisputed facts show that Echo made the decision to terminate the Distributor Agreement with TMI in August 2008. TMI has not identified any alleged wrongful conduct by LEPCO that preceded Echo's decision to terminate the agreement

at issue. TMI bases its tortious interference claim on a presentation LEPCO made to Echo on September 30, 2008, regarding LEPCO's ability to take over TMI's sales territory. Common sense dictates that a termination cannot be caused by an event which took place after the decision to end the contract had been made. TMI has not presented any evidence of any action by LEPCO that could have caused Echo to terminate the Distributor Agreement. In the absence of any genuine issue of fact on the causation question, we grant LEPCO's motion for summary judgment as to TMI's tortious interference and CUTPA claims.

**B. Count VI Of TMI's Complaint - Unjust Enrichment**

LEPCO argues that it is entitled to judgment as a matter of law on TMI's unjust enrichment claim because TMI has not produced any evidence of wrongful conduct or mistake. A plaintiff seeking recovery under an unjust enrichment theory must prove that "the defendant unjustly retained a benefit to the plaintiff's detriment[] and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs.*, 545 N.E.2d at 679, *see also Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 649 A.2d 518, 522 (Conn. 1994) (listing same elements of unjust enrichment action under Connecticut law). TMI asserts two alternative bases for why it should recover under an unjust enrichment claim. TMI first contends that LEPCO should be held liable for unjust

enrichment because it tortiously interfered with TMI's Distributor Agreement with Echo. Our conclusion that LEPCO did not tortiously interfere with TMI's relationship with Echo as a matter of law precludes TMI from employing LEPCO's alleged wrongful conduct as a basis for recovery on its unjust enrichment claim. TMI's second contention is that LEPCO should compensate TMI because Echo mistakenly gave the distribution rights for TMI's territory to LEPCO when the distributorship rightfully belonged to TMI as a result of an alleged franchise relationship between the parties. Our finding that no franchise relationship existed between TMI and Echo prevents TMI from recovering for unjust enrichment using this alternative theory as well. TMI has not presented any cognizable legal ground upon which to recover for unjust enrichment and, therefore, LEPCO's motion for summary judgment on TMI's unjust enrichment claim is granted.

## CONCLUSION

Echo's motion to strike is granted in part and denied in part. Echo's motion for summary judgment is granted. LEPCO's motion for summary judgment is granted.

Charles P. Kocoras
Charles P. Kocoras
United States District Judge

Dated: January 18, 2011